```
                    UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF IOWA


In re:                            Chapter 11

Sunset Sow Farms, Inc.            Bankr. No. 10-00238 S
     Debtor.
```

DECISION RE: MOTION TO USE CASH COLLATERAL

Debtor Sunset Sow Farms, Inc. (hereinafter "Sunset") asks the court to authorize its use of $150,000.00 in cash collateral (docs. 84, 86). Heritage Bank (hereinafter "Heritage") objects. Final hearing on the motion was held September 8, 2010. Donald H. Molstad appeared as attorney for Sunset; A. Frank Baron appeared as attorney for Heritage.

The court has jurisdiction of this contested matter proceeding under 28 U.S.C. § 1334(a) and the District Court's order of reference. This is a core proceeding under 28 U.S.C. § 157(b)(2)(M).

Sunset proposes to use the cash collateral to restart operations at its facilities to engage in the business of custom farrowing swine. Sunset has been operating a swine farrowing business since 2000. The corporation is owned by David and Shannon Van Hooser. Sunset owns three parcels of real estate. The business operates at least two of the locations. One site is the Van Hoosers' home, but that site houses also a gilt isolation facility. Located at the second business site are gestation, farrowing, and breeding barns.

Sunset filed its Chapter 11 petition on February 9, 2010. David Van Hooser attributes the need to file to economic difficulties caused by high corn and fuel prices and by the outbreak of a disease called porcine reproductive and respiratory syndrome, or PRRS, which is a virus. One result of the virus is that it causes sows to abort their litters, after carrying them almost to full term. Van Hooser

says it is not easy to eradicate the disease from a herd.

He made the decision to liquidate the sow herd in order to purge the disease from his facilities, and second, to take advantage of the higher value of culled sows. Sows and pigs were sold after the bankruptcy filing. As of the hearing date on the pending motion, all livestock had been sold. After the liquidation, Sunset cleaned and disinfected its facilities. The removal of swine and fecal material deprives the virus of any hosts.

Pursuant to agreement among Sunset and creditors claiming interests in the livestock, the proceeds of sales were placed in one of two accounts. Proceeds from the sales of sows and gilts were placed in what has come to be called the "sow account," and proceeds of the sales of pigs were placed in what is now termed the "pig account." There is $921,490.89 in the sow account; there is $150,000.00 in the pig account. Prior to the hearing, pursuant to agreement among the debtor and secured claimants, operating expenses had been paid from the pig account. Heritage claims an interest in the cash collateral which is in the pig account. Sunset's attorney says that other secured creditors claim an interest only in the sow account. However, this is not readily apparent from the record in the case. See Adv. No. 10-9017 and cash collateral motion (doc. 86).

From the standpoint of the PRRS disease, Sunset is now ready to restart breeding, farrowing, and weaning swine. Since it filed its bankruptcy, it has been negotiating with Fehr Pork Farms, Inc. (hereinafter "Fehr") regarding a custom farrowing arrangement.

These negotiations have led to Fehr's execution of a letter agreement sent to David Van Hooser, as the representative of Sunset (exhibit 1). The letter provides that Fehr will supply a sow herd owned by it to Sunset so that Sunset can breed the sows and farrow

and wean pigs.  The population of the breeding stock is expected to range from 3,900 to 4,800 head.  Sunset would have no responsibility for feed or veterinary costs.  It would be responsible for labor costs, utilities, fuel, insurance, maintenance, supplies, accounting, and other costs in operating the custom facility.

Fehr would pay Sunset $16.00 per pig transferred to Fehr after weaning.  The letter estimates a minimum income to Sunset of $1,478,400 per year, based on the transfer of 22 pigs per sow per year.

There is some dispute as to whether the letter constitutes an agreement between Fehr and Sunset.  Counsel for Heritage contends it is merely a letter of intent to enter into an agreement.  Counsel for Sunset appears to agree.  Van Hooser believes it is a contract.  Fehr does so also: "This document is issued by Fehr Pork Farms, Inc. as an agreement to enter into a business arrangement with Sunset Sow Farms, Inc., for the purpose of a custom farrowing agreement utilizing their swine facilities, and management, to produce weaned pigs from breeding swine owned solely by Fehr Pork Farms, Inc."  Exhibit 1, ¶ 1.  The effectiveness of the agreement depends, however, on the outcome of the cash collateral motion:

> This document is subject to Mr. Van Hooser and Sunset Sow Farms, Inc. receiving approval by the bankruptcy court of an adequate amount of cash collateral needed to operate Sunset Sow Farms, Inc. normal daily expenses that occur from the initial stocking of breeding stock by Fehr Pork Farms, Inc. until the first viable weaned pigs are sold/transferred to Fehr Pork Farms, Inc.

Exhibit 1, p. 3, ¶ 2.

There would be no transfer of weaned pigs or income to Sunset from the agreement until the fifth month after the population of the

facilities.  Exhibit 2 estimates the costs to Sunset of operating prior to the receipt of any income.  There are three changes to the figures shown in the exhibit.  First, rather than beginning in August, the expenses of starting the custom farrowing operation would begin in September, and the six months covered by the exhibit would go through February.  Second, Van Hooser estimates there have been $7,000.00 of additional costs already incurred in August.  Third, the $40,000.00 charge for draining the sewage lagoon, estimated for November, would be deferred until after Sunset began receiving income.  The deferral is possible because Fehr has drainage equipment and would do the work, but defer the charge.

These changes lead to the following estimate of costs for the first six months of the custom operation:

| Month | Amount |
|---|---|
| August | $ 7,000 |
| September | 24,750 |
| October | 24,750 |
| November | 23,250 |
| December | 27,500 |
| January 2011 | 37,500 |
| February | 42,500 |
| Total: | $187,250 |

Sometime after January, Sunset would pay Fehr the $40,000.00 lagoon drainage cost.  It is estimated that Sunset would begin receiving income from the agreement in February.  The cost of operating until February 1 would be $187,750.00.  February's costs would be $42,500.00 if they did not include the lagoon drainage cost and $82,500.00 if they did.

Income, at the estimate of 9,000 pigs weaned per month, would be $144,000.00 in February.  This amount would be sufficient to pay February's estimated costs.

4

The adequate protection offered by Sunset for the use of $150,000.00 in cash collateral through the end of January 2011 is a replacement lien in the account receivable income from the contract with Fehr.  Amended Motion, ¶ 4 (doc. 86).  There would be no periodic payment to Heritage.  Moreover, there appears to be no equity cushion in the collateral securing Heritage's claim, as Heritage is likely significantly undersecured.  It appears that repayment from the account receivable would be through the proposed plan (doc. 78).  Under the plan, Heritage's claim against Sunset would be divided, by loans, into five classes, 4(a) through 4(e). From the plan description, a secured claim against livestock would appear to be included in class 4(a).  This would be repaid over 20 years.  Proposed plan, p. 10, ¶ 4 (doc. 78).

Heritage does not consent to the use of its cash collateral absent adequate protection.  Heritage contends that the protection offered is not adequate.

It is the court's responsibility to establish the value of the bank's interest, to identify the risks to its interest from the debtor's use, and to determine "whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence."  Martin v. United States (In re Martin), 761 F.2d 472, 476-77 (8th Cir. 1985).

I find and conclude that Sunset's offer of adequate protection is not satisfactory to protect Heritage's interest of the $150,000.00.  It proposes to pay Heritage over 20 years, based on a new contract which would not produce income for five months, and which contains no fixed term of months or years.  In fewer than six months, the collateral would be spent, leaving Heritage with only

5

the prospect of being repaid out of an agreement that cannot assure Sunset of the ability to repay over such a long period.  Moreover, it appears that likelihood of repayment may depend on plan confirmation, which is far from certain.  The court will deny Sunset's motion.

The court finds it regrettable that Sunset and Heritage failed to work together on the custom contract.  This they had agreed to do in a prior stipulation.  Stipulation, ¶ 6 (doc. 41).  Heritage learned of the Fehr agreement only shortly before the hearing on the pending motion.

IT IS ORDERED that the motion to use cash collateral is denied.

Dated and Entered: September 14, 2010

William L. Edmonds, Bankruptcy Judge